# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WALTER ALBECKER, | ) | |
| | ) | No. 09 C 00631 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CONTOUR PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Walter Albecker filed this lawsuit against Contour Products, Inc. to enforce his U.S. Patent No. 5,836,653 ('653 Patent) and to seek a declaration that U.S. Patent No. 6,823,545 ('545 Patent), owned by Contour, is invalid.[1] R. 1, Compl. The '653 Patent describes wedge-shaped backrest and legless leisure-chair designs that support the sitter's lower back by maintaining the back's lumbar region in a natural curve. R. 54, Claim Constr. Order at 2. In July 2009, the previously assigned judge denied Contour's motion to dismiss the declaratory judgment count for lack of subject matter jurisdiction. R. 26. And in May 2010, after claim construction briefing by both sides, the previously assigned judge issued an order construing certain disputed terms contained in Claim 10 of the '653 Patent. Claim Constr. Order at 7-18. Albecker now seeks reconsideration of the claim construction, R. 57, while Contour seeks reconsideration of the denial of its motion to dismiss, R. 60. For the reasons explained

---

[1]In this federal question case, the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

more fully below, Albecker's motion for reconsideration [R. 57] is denied and Contour's motion [R. 60] is granted.

## I. Background

In January 2009, Albecker filed a complaint against Contour Products, accusing Contour of producing and selling chairs that infringe Albecker's '653 Patent. *See* Compl. ¶¶ 5, 8-9. The '653 Patent describes wedge-shaped backrests and legless leisure chairs for sitting on the floor or on a bed and are designed to maintain the lumbar region of the sitter's back in a relatively natural lordotic curve. R. 46, Exh. A, '653 Patent at 1. The only issue on the table right now is Claim 10 of the patent, which describes a backrest/leisure chair comprising:

> (a) a relatively firm generally wedge shaped foundation having a face, a base, a back and two generally triangular sides, with the base being positioned parallel to a horizontal plane such as a floor or bed, and the face being oriented at an acute angle relative to both the base and the horizontal plane to define a generally wedge shape, wherein said face has an upper portion and a lower portion, wherein said upper portion has an average general pitch relative to the horizontal plane and said lower portion base an average general pitch relative to the horizontal plane, and wherein said face further has a contour which orients the average general pitch of upper portion of the face at a greater incline than the average general pitch of the lower portion;

> (b) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and

> (c) a top cushion having an upper and lower portion *secured to* the face of the generally wedge shaped foundation.

*Id.* col. 18 ll. 15-41 (emphasis added).

2

At the core of the parties' dispute is the last paragraph of Claim 10, limitation (c). After considering each side's proposed claim constructions, the previously assigned judge issued an order construing the following disputed claim terms in the following ways:

1.  "Top cushion" refers to "the top 4" of material on the face of the foundation or the cushioning material on the face of the foundation." Claim Constr. Order at 13.

2.  "Secured to" means "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." *Id.*

3.  "Face of the generally wedged shaped foundation" is "the top surface of the wedge shaped foundation." *Id.* at 14.

It is the second term, "secured to," that Albecker continues to contest. Essentially, by construing "secured to" as "attached using attachment means," the Court held that limitation (c) is satisfied *not* by a one-piece product with a top cushion that is "integral and continuous" with the foundation, but by a two-piece product whose top cushion is physically attached or "secured to" the foundation. Claim Constr. Order at 13. In light of that construction, Albecker now moves to reconsider, asserting that "secured to" should simply mean "attached to" with no reference to attachment means. *See* R. 58, Pl.'s Br. at 2. Thus, Albecker believes that "secured to" encompasses both one- and two-piece products.

For its part, Contour independently moves to reconsider the previous denial of the motion to dismiss the declaratory judgment count in Albecker's complaint. In its brief, Contour asserts that this Court lacks subject matter jurisdiction to declare

Contour's '545 Patent invalid under the Declaratory Judgment Act, 28 U.S.C. § 2201, because there is no case or controversy over the '545 Patent. R. 61, Def.'s Br. at 4-8.

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) states that a court may reconsider an interlocutory ruling "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed R. Civ. P. 54(b). Motions for reconsideration serve the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (citation omitted). Thus, a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). But a motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted).

In the context of claim construction, a motion for reconsideration may be raised at any stage of the case. *See, e.g., Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (after preliminary injunction ruling); *Bone Care Int'l LLC v. Pentech Pharm., Inc.*, 2010 WL 3023423, at *1 (N.D. Ill. July 30, 2010). Indeed,

4

the Federal Circuit has noted that "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman*, 302 F.3d at 1361 (citation omitted). Still, there must be some reason, whether factual or legal, to reconsider a construction.

### III. Analysis

### A. Albecker's Motion to Reconsider

Albecker moves to reconsider the Court's prior construction of limitation (c) of claim 10. Specifically, he disputes the construction of the term "secured to," which the Court interpreted as "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." Claim Constr. Order at 13.

Generally, when construing claim terms, courts should look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (internal quotation marks and citations omitted). Out of these sources, the intrinsic evidence (which includes the patent claims, specification, and prosecution history) is key to determining the meaning of a disputed term. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

Although Albecker tries to use intrinsic evidence in arguing the reconsideration motion, none of the arguments justify changing the construction. First, he asserts that

5

the Court's construction of "secured to" excludes all embodiments made with an injection-molding manufacturing process, thus impermissibly importing process limitations. *See* Pl.'s Br. at 7-8. As a procedural matter, this argument is rejected because it was previously raised during the initial round of claim-construction briefing, *see* R. 45 at 8-9, and thus rehashing it is not a proper argument for a motion to reconsider. Albecker's argument also fails on the merits. It fails as a matter of law, because the case that he relies on—*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008)—reasoned that courts must generally take care not to import process limitations from process *claims* into apparatus *claims*, *id.* at 1344, but *all* of Albecker's claims are apparatus claims. Because there are no process claims in this case, *Baldwin*'s concern about impermissible importing from claim to claim does not directly apply. Albecker's argument also fails as a factual matter, because although the specification does teach injection molding as a way to make a "high firmness support foundation," *see* '653 Patent col. 13 ll. 17-39, the specification also teaches using "firm internal support members to provide the equivalent of a relatively firm foundation," and even explicitly refers to this method as "[a]nother way to make an embodiment." *Id.* col. 13 ll. 40, 42-44. Indeed, in discussing this production method, the specification even instructs that "[t]he soft wedge shaped foundation and top cushion could be made in one piece *or made of two pieces* in a manner similar to that shown for Figs. 3A and 3B," *id.* col. 13 ll. 48-51 (emphasis added), which means that the Court's construction of "secured to"—which requires the use of physical attachment means—does not rule out production methods.

6

Second, Albecker points to his patent-specific definition of the term "top cushion" ("the top 4" of material on the face of the foundation is considered to be the top cushion"), which the Court adopted in its claim construction. *See* '653 Patent col. 10 ll. 8-12. Because this definition appears in the section of the specification discussing the embodiment disclosed in Figure 1E—which has a top cushion that is integral and continuous to the foundation—Albecker believes that a construction of "secured to" requiring the use of a means of physical attachment contradicts his patent-specific definition of "top cushion." Pl.'s Br. at 8-9. Again, Albecker made this argument in his opening claim-construction brief. *See* R. 45 at 11. Even if the Court were to reconsider an already-made argument, the argument still fails. Yes, Albecker may act as his own lexicographer, *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed Cir. 2003) (citations omitted), but Albecker's definition of "top cushion" is not explicitly limited to an embodiment consisting of a foundation with an integral and continuous top cushion. Despite the definition's location in the specification, nothing in the definition suggests that it only applies to claims reading on that embodiment and not to claim 10. Rather, the definition, by its own terms, applies generally "[f]or the purposes of the claims," '653 Patent col. 10 ll. 8-9, which naturally includes claim 10. And more importantly, Albecker qualified his definition with this clause: "and though it may technically [sic] the same material, it is considered as a *foundation* with a top cushion." *Id.* col. 10 ll. 10-12 (emphasis added). By taking pains to point out that this particular embodiment still has a foundation and a top cushion *although* the pieces are made of the same material, Albecker himself suggests that in the other

7

embodiments the top cushion and foundation are normally *not* made of the same material, and instead must be secured to each other with a means of physical attachment. Instead of contradicting the Court's construction of "secured to," therefore, the Court's construction of "top cushion" actually supports it.

Albecker's third argument, however, does get some traction—though ultimately not enough to change the construction. Albecker contends that the Court's construction of "secured to" excludes the embodiment disclosed in Figure 1E, which describes a one-piece product with a top cushion that is integral and continuous with the foundation, *see* Pl.'s Br. at 3-6, and a claim construction that excludes embodiments disclosed in the specification is usually wrong, *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed Cir. 2002) (citation omitted). In response, Contour asserts that the Court's construction of "secured to" does not impermissibly exclude disclosed embodiments because Albecker withdrew his one-piece product claims in favor of prosecuting a two-piece species of invention in response to a restriction requirement issued by the Patent and Trademark Office (PTO). *See* R. 84 at 3-11.

In reply to Contour's argument, Albecker argues that the PTO did not actually issue a restriction requirement. Contrary to Albecker's belief, however, the prosecution history does show that the examiner issued a restriction requirement. Specifically, after Albecker submitted his initial patent application, the examiner issued an Office Action in July 1996 that listed a variety of distinct species in Albecker's application and required him to "elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable.

8

Currently, no claim is generic." R. 84-2, Def.'s Exh. A at 72, 73. In response to the PTO, Albecker elected "the species shown in FIG.s 1A-C" (the figures disclose a chair with a *separate* foundation and top cushion), selected numerous claims that read on those species, and withdrew the other claims from consideration. '653 Patent figs. 1A-C; Def.'s Exh. A at 74; *see also* Def.'s Exh. A at 78-79 (listing claim 12 as withdrawn from consideration because it was drawn to a non-elected species). Albecker elected this species without "traversing," or disputing, the examiner's election requirement. *See* Def.'s Exh. A at 79 ("Election was made *without* traverse . . . ."); *see also* MANUAL OF PATENT EXAMINING PROCEDURE § 818.03 (laying out the requirements to traverse). The claims that Albecker withdrew included the new claim 11 that describes a one-piece chair with a top cushion that is integral and continuous with the foundation. *See* '653 Patent col. 18 ll. 42-44. Although Albecker asserted that claims 11 and 21 (the claims that would become claims 10 and 20 in the '653 Patent) are generic, the record does not show that the examiner ever agreed.[2] Thus, all of the withdrawn claims—including the new claim 11—remained withdrawn after the application's restriction. 37 C.F.R. § 1.146; *St. Jude Med., Inc. v. Access Closure, Inc.*, — F.3d —, 2013 WL 4826148, at *7 (Fed. Cir. Sept. 11, 2013) ("Since no generic claim was applied for, and no such claim

---

[2]Albecker appears to allege that he discussed the withdrawn claims with the examiner by phone, *see* R. 86 at 2-4, but the examiner's Interview Summary only discloses that claims 1, 4, 11, and 21 were discussed and that "[s]ome changes were agreed upon to better define the claims over the prior art, and an amendment will be faxed for further consideration." Def.'s Exh. A at 93. The examiner never recorded that he discussed Albecker's withdrawn claims at all. Nor did Albecker ever file his own summary of that interview in his prosecution history file. Thus, there is no evidence in the documentary record that the examiner ever orally agreed that the withdrawn claims could be reinstated, or that the examiner ever orally found that any claim was generic.

was finally held allowable, that is what occurred: the election of species in the grandparent created a *restriction*."). Ultimately, Albecker, in the eyes of the PTO, did not pursue a one-piece invention.[3]

But just because Albecker elected—in response to an unexplained restriction requirement—a two-piece species rather than a one-piece species does not necessarily mean that, as a matter of law, Albecker purposely *chose* to claim solely a two-piece invention and disclaim a one-piece invention. The Federal Circuit has very recently cautioned courts from concluding that a patentee has disclaimed claim-scope simply by withdrawing certain claims after receiving an unexplained restriction requirement imposed by the PTO. In *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed Cir. 2013), Plantronics received a patent for a "concha-style" cell phone headset. *Id.* at 1346. After Plantronics sued Aliph for infringement, the district court construed certain stabilizers in the headset claims as requiring "elongated" structures and granted summary judgment to Aliph. *Id.* at 1348-49. On appeal, Aliph pointed to the prosecution history to argue that the district court properly construed the stabilizers as requiring elongated structures and not arch-shaped or torus-shaped structures. *Id.* at 1350. During prosecution, the PTO issued a restriction requirement in which the examiner instructed Plantronics to elect one of four distinct inventions or species (at least the

---

[3]To the extent that Albecker argues that his withdrawn claims were rejoined under the PTO process of rejoinder, rejoinder only allows applicants to present claims "directed to the process of making and/or using the patentable product." MANUAL OF PATENT EXAMINING PROCEDURE § 821.04. But Albecker's withdrawn claim 11 is a product claim, not a process claim, so rejoinder does not apply. And even if it did apply, there is again no record evidence that claim 11 or any other claim reading on the embodiment disclosed in Figure 1E was ever rejoined, or was "fully examined for patentability in accordance with 37 C.F.R. § 1.104." *Id.*

PTO believed them to be distinct). *Id.* Specifically, the PTO directed Plantronics to elect "a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable," and also contemporaneously stated that the application presented no "generic claim" covering more than a single species of the invention. *Id.* (internal quotation marks omitted). In response, Plantronics elected, without traverse, to prosecute only the first species, indicated which claims read on that species, and contended that one of those claims was generic. *Id.* That species happened to have elongated stabilizers. *See id.* Based on this prosecution history, Aliph contended that the claim construction was properly limited to the single invention depicting a single embodiment having one elongated stabilizer because Plantronics elected to pursue that invention rather than an invention with stabilizers of different shapes. *See id.*

The Federal Circuit rejected this argument. It reasoned that the PTO's restriction requirement provided no explanation why the inventions differed such that they were patentably distinct, let alone explained more specifically what difference arose from one invention having an elongated stabilizer and not an arch stabilizer. *Id.* at 1351. In fact, the Federal Circuit noted that more than one of the PTO's listed species contained elongated stabilizers, which refuted Aliph's contention that the PTO's restriction requirement was based on that structural difference. *Id.* And although Plantronics elected the first species without traverse, Plantronics did disagree with the PTO by saying, in the response to the PTO, that one of the claims was a generic claim that read on all of the embodiments illustrated in the application.

*Id.* Because of this ambiguous prosecution history, the Federal Circuit held that Plantronics did not disclaim its non-elongated-stabilizer inventions during prosecution: "The election of an invention in response to an ambiguous restriction requirement in turn cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim." *Id.* (citation omitted).[4]

*Plantronics* undermines Contour's argument that Albecker intentionally disclaimed a one-piece chair in the prosecution history. Here, the PTO required Albecker to elect one of nine different species of inventions to pursue, using nearly identical language to that used in *Plantronics. Compare id.* at 1350 ("Accordingly, the PTO directed Plantronics to elect 'a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable.' The PTO also concluded that the application presented no 'generic claim' covering more than a single species of the invention." (citation omitted)), *with* Def.'s Exh. A at 72 ("Applicant is required . . . to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, no claim is generic."). The PTO never explained to Albecker what distinguished each of the nine species from each other, making its

---

[4]*Plantronics'* holding does drive home how important it is for the PTO to explain, as much as practicable (the PTO's workload is enormous), the grounds for restriction requirements and the reasons why the examiner believes that the proposed claims set forth patentably distinct inventions. Under *Plantronics*, when the restriction requirement is not explained, an inventor can avoid disclaimer by simply noting bare-bones disagreement with the examiner's opinion that no claims are generic. The prosecution then moves on with the possibility that the examiner and the inventor have fundamentally different views of the scope of the claims and the probability that the public-information function of the patent is impaired.

restriction requirement just as ambiguous as *Plantronics*'. Indeed, a review of the figures disclosing the nine different inventions delineated by the PTO reveals that some of the unelected embodiments *also* have a foundation and cushion that are physically separate pieces, which likewise refutes Contour's contention that the PTO distinguished the inventions by their number of components. *Compare* '653 Patent fig. 1D, *with id.* fig. 1E. If the examiner had a one-piece versus two-piece distinction in mind, the examiner did not communicate that reasoning to Albecker. And just like in *Plantronics*, despite electing the first species without traverse (that is, without objection), Albecker disagreed with the PTO by responding that two of his claims were generic. *See* Def.'s Exh. A at 74. So Albecker did not fully accede to the PTO's findings either. Under *Plantronics*, then, this Court cannot draw the conclusion that Albecker's election of species represented a clear and unambiguous choice to pursue a two-piece invention specifically instead of a one-piece invention. *See* 724 F.3d at 1351. And that means that this Court may not so lightly dismiss the fact that its construction of "secured to" excludes the unelected embodiment depicted in Figure 1E.

But a claim construction that excludes a preferred embodiment—if Figure 1E is preferred—may still be correct if there is highly persuasive evidentiary support for that construction. *Rheox*, 276 F.3d at 1327 (internal quotation marks and citation omitted). And the bulk of the intrinsic evidence supporting the Court's prior construction of "secured to" (remember that the term refers to "attached using attachment means, such as an adhesive or mechanical type fasteners") rises to that

13

level. First, the term "secured to" is used several times throughout the claim language to refer to the physical attachment of two separate pieces. *See* '653 Patent col. 18 ll. 1-3 ("The backrest/leisure chair of claim 1 further including a seat cushion having an attachment means secured to the lower portion of the foundation . . . ."); *id.* col. 18 ll. 12-14 ("[W]herein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation."); *id.* col. 19 ll. 3-5 ("The backrest/leisure chair of claim 10 further including a seat cushion having an attachment means secured to the lower portion of the foundation . . . ."); *id.* col. 19 ll. 14-16 ("[W]herein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation."). These different claims use "secured" in the context of affixing physically separate pieces to each other, rather than describing a single "integral and continuous" piece. Because a claim term should be construed consistently with its use in other claims, *Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1299 (Fed. Cir. 2011) (citation omitted), the '653 Patent's claim language supports the construction of "secured to" as requiring attachment means, such as physical fasteners.

The specification, which is "the single best guide to the meaning of a disputed term," *Vitronics*, 90 F.3d at 1582, also repeatedly uses "secured to" to describe the physical attachment of separate pieces to each other. For example, in referring to the attachment of the seat cushion to the foundation—the key disputed language in claim 10—the specification instructs, "Unlike the head pillow straps mentioned above, this upholstery attachment means 35 or a similar means of securing the seat cushion 34 to the foundation 42 are essential to the proper working of . . . this embodiment." '653

14

Patent col. 8 ll. 27-30. And the specification further insists that the seat cushion be fastened tightly to the foundation with straps:

> Though the methods of securing the straps to the support foundation will vary with the type of material the support foundation is made of, the straps must be secured well enough to the support foundation to keep the seat cushion from moving away from the support foundation when a person is sitting on it.

*Id*. col. 10 l.64-col. 11 l.2; *see also id*. col. 10 ll. 61-64 ("The seat cushion 34 is attached to straps 35 or another suitable upholstery attachment means which would be secured either directly or indirectly to the high firmness support foundation."). The specification therefore uses "secured to" when describing the seat cushion and the foundation as two separate pieces that are physically attached to each other with straps or other attachment means. Similarly, the specification elsewhere uses "secured to" when teaching that the seat cushion and head pillow should be physically fastened to other parts of the chair. *See, e.g.*, *id*. col. 8 ll. 54-58 ("The same type of technique could be used to close the bottom of the upholstery 30 on the top cushion 26—though it is not necessary that both the seat cushion 34 and top cushion 26 be secured together in this manner."); *id*. col. 10 ll. 59-61 ("In FIG. 2A the head pillow 32 is attached to straps for the head pillow 33 which are secured to the support foundation 42."). Likewise with the specification's description of the attachment of the upholstery to the foundation. *Id*. col. 12 ll. 26-28 ("The upholstery 30 is secured around the support foundation 42 and of course around the main cushion 26."). Thus, no matter which piece the specification discusses—the top cushion itself, the seat cushion, the head pillow, or the cushion's upholstery—it teaches the physical attachment of that separate

piece to each other or to the foundation, thus securing the pieces together. Indeed, the specification even goes so far as to explicitly *differentiate* between a foundation with a secured, or separate, top cushion, and a foundation with an integrated top cushion. *See id.* col. 6 ll. 48-50 ("This convex lumbar support can be integral and continuous with the foundation, *or* can be secured to the top of the lower portion of the foundation . . . ." (emphasis added)). Accordingly, the '653 Patent's specification also support the Court's construction of "secured to."

So do other parts of the '653 Patent's prosecution history. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citation omitted). During examination, in an October 1996 letter to Albecker, the patent examiner originally rejected what would become claim 10 on obviousness grounds, finding that adding "an overlying cushion member" for additional comfort was obvious in light of the prior art. *See* Def.'s Exh. A at 80. Thus, the PTO believed claim 10 to claim a foundation with an "overlying" seat cushion, which naturally suggests that claim 10 intended the foundation and seat cushion to be two separate pieces and not a single and continuous piece. And in an *ex parte* reexamination proceeding, the PTO found that the prior art did not anticipate a "top cushion secured to the face of the foundation" because the prior art teaches only "a pillow with a cover" and "a single pillow structure." R. 84-8, Def.'s Exh. F at 4, 5, 6. By explicitly differentiating between "a top cushion secured to the face of the foundation" and "a pillow with a cover" or a "single pillow structure," the PTO therefore understood Albecker to be claiming a two-

16

piece invention (with the seat cushion and foundation physically attached together) rather than a one-piece invention.

Despite the ambiguous restriction requirement, therefore, all signs but one point to the Court's previous construction of "secured to," which means "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." And the weight of this textual evidence—which is more useful than the prosecution history, *see Phillips*, 415 F.3d at 1317 (citations omitted)—means that Albecker has not carried the heavy burden that he must on motions to reconsider. *See Bank of Waunakee*, 906 F.2d at 1191. Accordingly, his motion is denied.

## B. Contour's Motion to Reconsider

Contour separately moves to reconsider the Court's decision to deny its previous motion to dismiss the declaratory judgment count in Albecker's complaint for lack of subject matter jurisdiction. In Contour's view, that count seeks to declare Contour's '545 Patent invalid, yet the '545 Patent has nothing to do with this case, and more importantly there is no actual case or controversy over it. Def.'s Br. at 6-8.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Although an action for declaratory relief can itself be a case or controversy under Article III, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties

17

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127-28 (2007) (internal quotation mark and citation omitted). In the patent-infringement context, a would-be declaratory judgment plaintiff (here, Albecker) who is not the patentee may satisfy Article III's case-or-controversy requirement by seeking a declaration of his legal rights without risking an infringement suit if the patentee "asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed Cir. 2007) (citation omitted). Put differently, "Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *Id.*

Contour has not put Albecker in that position. Albecker's complaint does not allege, for example, that Contour sent him a cease-and-desist letter that warned him to stop infringing its '545 Patent or else defend an infringement suit. *Cf. Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326-27 (Fed. Cir. 2002) (holding that the district court had subject matter jurisdiction despite the assertion of a defense of license where the patentee sent several cease-and-desist letters to the defendant and filed suit for infringement). Instead, Albecker alleges in his complaint that Contour's CEO, E. Scott Davis, told Albecker that "Contour Products had a patent on its product and, as a result, [Davis] did not understand why [Albecker] believed his patent had been

18

infringed." Compl. ¶ 19. But this allegation itself reads as merely a statement by Davis in response to allegations of infringement made by Albecker, which is a far cry from a *warning* by Davis that Albecker infringed Contour's '545 Patent. Indeed, "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1362-64 (Fed. Cir. 2009) (holding that declaratory judgment jurisdiction existed only because the patentee's letters to the plaintiff identified the patent as relating to a specific product line, imposed two-week deadlines to respond, and insisted that the plaintiff not file suit). Albecker's complaint, therefore, does not allege that Contour placed Albecker in a position where he could only choose between infringing Contour's patent or abandoning what he believed were legal rights.

Instead, now that this Court has denied Albecker's motion to reconsider its prior claim construction,[5] it is clear that the '545 Patent has no bearing on this case. Albecker's complaint alleges only that Contour infringed Albecker's '653 Patent. *See* Compl. ¶¶ 7-12. Thus, only the '653 Patent is at issue. It is significant too that Contour has not injected the '545 Patent into this case by asserting it as a defense, *see* R. 17,

---

[5]This decision is a new event that enables Contour to renew its motion to dismiss Albecker's declaratory judgment count by moving to reconsider. *See Rothwell Cotton Co.*, 827 F.2d at 251. Thus, Albecker's assertion that Contour cannot bring its motion because it lacks new evidence under Rule 60(b) is not well-taken, even if Rule 60(b) applied to motions to reconsider. *See* R. 63 at 9-10.

Def.'s Answer at 3-4, or as a counterclaim, *see id.* at 4-6 (counterclaiming only that Albecker's '653 Patent is invalid). Indeed, even when Contour previously sued Albecker in the Southern District of Florida (more on this below), Contour's complaint sought a declaration that it had *not* infringed Albecker's '653 Patent instead of a declaration that Albecker had infringed its '545 Patent. Complaint, *Contour Products, Inc. v. Albecker*, 08-cv-60575-WPD (S.D. Fla. Apr. 22, 2008), R. 1. The '545 Patent is not even invalidating prior art, because according to Albecker's complaint itself, Contour filed its '545 Patent after Albecker filed his '653 Patent. Compl. ¶ 21; *see also* R. 19 at 2 (stating that the '545 Patent has a filing date of May 16, 2003 and the '653 Patent has a filing date of June 19, 1995). When viewed from every angle, this case is about the '653 Patent, not the '545 Patent, so the Court has no subject matter jurisdiction to declare that the '545 Patent is invalid. *See SanDisk*, 480 F.3d at 1380-81 ("[D]eclaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement . . . .").

The only substantive argument that Albecker raises in response—that is not an argument about the previously assigned judge's case-management procedures, *see* R. 63 at 6-9, 13-14—is that Contour is judicially estopped from contesting subject matter jurisdiction because it previously argued that the Southern District of Florida had subject matter jurisdiction over its own declaratory judgment action. *See id.* at 11-12. "Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so."

20

*Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) (citation omitted). But as a threshold matter, the law is skeptical about allowing litigants to employ judicial estoppel to create subject matter jurisdiction when jurisdiction would otherwise not exist. *Lara v. Trominski*, 216 F.3d 487, 495 n.9 (5th Cir. 2000) ("We are especially wary of applying judicial estoppel to create subject matter jurisdiction in the federal courts." (citation omitted)); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Indeed, it has been cautioned that special care should be taken in considering whether judicial estoppel should even apply to matters affecting federal subject matter jurisdiction." (internal quotation marks and citation omitted)); *cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) ("When questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." (internal quotation marks and citation omitted)). After all, Contour and Albecker cannot waive arguments that the Court lacks subject matter jurisdiction and cannot stipulate between them that subject matter jurisdiction exists, *United States v. Cnty. of Cook, Ill.*, 167 F.3d 381, 387 (7th Cir. 1999), so any stance they previously took ought not to preclude them—or, more importantly, the Court—from reevaluating jurisdiction in the future. In any event, even if judicial estoppel did apply in this context, it requires that a litigant pursue a position that is "clearly inconsistent" with the position it asserted in prior litigation. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotations and citations omitted). As mentioned above, Contour previously asserted that the Southern District of Florida had subject matter jurisdiction to declare

21

that Contour had not infringed Albecker's '653 Patent. Pl.'s Opp'n to Def.'s Mot. Dismiss, *Contour Products, Inc. v. Albecker*, 08-cv-60575-WPD (S.D. Fla. Oct. 31, 2008), R. 13 at 2-9. That previous position is *not* clearly inconsistent with Contour's position now, which is that this Court lacks subject matter jurisdiction to declare that *Contour's* '545 Patent is invalid. Because this litigation involves a different plaintiff suing over a different patent and asserting a different doctrine of patent law, Albecker has not taken a clearly inconsistent position here. Judicial estoppel does not bar Contour's motion.[6]

Accordingly, because there is no case or controversy involving Contour's '545 Patent in this case, Albecker's declaratory judgment count is dismissed for lack of jurisdiction.

## IV. Conclusion

For the reasons explained above, Albecker's motion to reconsider [R. 57] is denied and Contour's motion [R. 60] is granted. Before the next status hearing, the parties shall confer and file a written status report expressing their respective positions on the case's appropriate next step. If Contour's product is a one-piece chair, then one possibility is for the Court to enter judgment for Contour, with Albecker preserving his objection to the claim construction and preserving his right to appeal it. The written status report is due by October 23, 2013. At the next status hearing on

---

[6]Albecker also asserts that Contour's motion is untimely under Rule 59(e), R. 63 at 9, but motions to reconsider are decided under Rule 54, which provides that interlocutory orders "may be revised *at any time* before the entry of a judgment." Fed. R. Civ. P. 54(b) (emphasis added).

October 30, 2013, the parties should be prepared to address the case schedule moving

forward.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 27, 2013